Slip-Op. 19-72

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BIO-LAB, INC. ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD., <br><br> Defendant-Intervenors. | Before: Claire R. Kelly, Judge <br><br> Court No. 18-00051 <br> PUBLIC VERSION |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination.]

Dated: June 13, 2019

James R. Cannon, Jr., Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for plaintiffs, Bio-Lab, Inc., Occidental Chemical Corporation, and Clearon Corporation. With him on the brief were Jonathan M. Zielinski and Ulrika K. Swanson.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were Patricia M. McCarthy, Assistant Director, Jeanne E. Davidson, Director, and Joseph H. Hunt, Assistant Attorney General. Of Counsel on the brief was Catherine Miller, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, DC, argued for Defendant-Intervenors, Juancheng Kangtai Chemical Co., Ltd. and Heze Huayi Chemical Co., Ltd. With him on the brief were J. Kevin Horgan and Alexandra H. Salzman.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce" or "the Department") final determination in the 2015–2016 administrative review of the antidumping duty ("ADD") order on chlorinated isocyanurates from the People's Republic of China ("China" or "the PRC").  See <u>Chlorinated Isocyanurates From [the PRC]</u>, 83 Fed. Reg. 5,243 (Dep't Commerce Feb. 6, 2018) (final results of [ADD] administrative review; 2015–2016) ("<u>Final Results</u>") and accompanying Decision Mem. for the Final Results of [ADD] Administrative Review: Chlorinated Isocyanurates from China; 2015–2016, A-570-898, Jan. 29, 2018, ECF No. 25-5 ("Final Decision Memo").  Plaintiffs Bio-Lab, Inc., Clearon Corporation, and Occidental Chemical Corporation (collectively "Plaintiffs")[1] move for judgment on the agency record, challenging Commerce's determination to treat respondent Juancheng Kangtai Chemical Co., Ltd.'s ("Kangtai") sales to Customer X as "export price" sales and Commerce's use of respondent Heze Huayi Chemical Co., Ltd.'s ("Heze Huayi") labor usage rates in its calculation of normal value.[2]  See Pls.' Rule 56.2 Mot. J. Administrative R., July 24, 2018, ECF No. 29; Mem. Supp. Pls.' Mot. J. Administrative R. at 6–21, July 24, 2018, ECF No. 29-1 ("Pls.' Br."); <u>see also</u> Tariff Act of 1930 § 772, 19 U.S.C. § 1677a (2012).[3]  For the reasons that follow, the court remands Commerce's determination to treat Kangtai's sales to Customer X as export price sales and sustains Commerce's determination to use Heze Huayi's labor usage rates in its calculation of normal value.

---

[1] Bio-lab, Inc., Clearon Corporation, and Occidental Chemical Corp. were petitioners in the administrative proceeding below.  For purposes of this opinion, where referring to the administrative proceeding below, these parties are referred to as "Petitioners."

[2] Customer X is [[                                                    ]].

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

## BACKGROUND

On August 11, 2016, Commerce announced the initiation of its administrative review of the ADD order on chlorinated isocyanurates from the PRC, for which the period of review would be June 1, 2015 through May 31, 2016.[4]  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 53,121, 53,122 (Dep't Commerce Aug. 11, 2016).  Respondents Heze Huayi and Kangtai submitted separate rate certifications[5] and timely responses to Commerce's ADD questionnaires.  See Chlorinated Isocyanurates from [the PRC], 82 Fed. Reg. 35,183 (Dep't Commerce July 28, 2017) (preliminary results of [ADD] administrative review; 2015–2016) ("Prelim. Results") and accompanying Decision Mem. for the Prelim. Results of the 2015–2016 [ADD] Administrative Review: Chlorinated Isocyanurates from [the PRC], A-570-898, PD 108, bar code 3588004-01 (June 30, 2017) ("Prelim. Decision Memo").[6]  Commerce determined that Heze Huayi and Kangtai were both eligible for separate rates, and that

---

[4] Each year during the anniversary month of the publication of an ADD order, interested parties may request that Commerce conduct an administrative review of that order.  See 19 C.F.R. § 351.213; see also 19 U.S.C. § 1677(9) (defining interested parties).

[5] For non-market economy ("NME") countries, Commerce employs a rebuttable presumption that all companies within an NME are subject to government control and should therefore be assigned a single antidumping rate.  See Decision Mem. for the Prelim. Results of the 2015–2016 [ADD] Administrative Review: Chlorinated Isocyanurates from [the PRC] at 3–4, A-570-898, PD 108, bar code 3588004-01 (June 30, 2017) ("Prelim. Decision Memo").  Commerce treats the PRC as an NME country in all ADD proceedings.  See id. at 17.  Commerce's policy is to assign all exporters of subject merchandise in the NME country a single rate unless the exporter can prove its independence from the government.  To do so, Commerce requires entities who were assigned a separate rate in a previous segment of the proceeding to submit a separate-rate certification stating that they continue to meet the criteria for obtaining a separate rate.  Here, Heze Huayi and Kangtai previously demonstrated their eligibility for a separate rate and, accordingly, submitted separate rate certifications to Commerce.  See id. at 4.

[6] On April 23, 2018, Defendant submitted an index to the public administrative records, which can be found at ECF No. 25-2.  See Administrative Record, Apr. 23, 2018, ECF No. 25-2.  All further references to documents from the administrative record are identified by the numbers assigned by Commerce in these administrative records.

both had made sales in the United States at prices below normal value.  Prelim. Results, 82 Fed. Reg. at 35,183; see also Final Results, 83 Fed. Reg. at 5,244 (unchanged).

Two of Commerce's findings in the final determination are relevant to the present action.  First, in calculating Kangtai's dumping margin, Commerce relied on Kangtai's sales to Customer X, a purchaser operating in a third country, as export price sales, concluding that the sales were the first to an unaffiliated party outside the United States.  See Final Decision Memo at 4.  Commerce noted that it did so because Kangtai, in responding to Commerce's questions regarding Customer X, stated that it was not affiliated with Customer X pursuant to 19 U.S.C. § 1677(33) and provided record evidence supporting that position.  See id.  Second, in calculating Heze Huayi's dumping margin, Commerce opted to use Heze Huayi's reported labor usage rates as FOPs to calculate normal value, despite the Petitioners' claims that the rates had changed unreasonably from the prior two reviews.  Final Decision Memo at 6–7.

Plaintiffs commenced the present action on March 7, 2018.  See Summons, Mar. 7, 2018, ECF No. 1; Compl., Mar. 8, 2018, ECF No. 12.  Plaintiffs challenge both determinations, contending they are unsupported by substantial evidence and not in accordance with law.  See Pls.' Br. at 5–6.  The court held oral argument on May 20, 2019.  See Partially Closed Oral Arg., May 20, 2019, ECF No. 56 ("Oral Arg.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce's Reliance on Kangtai's Sales to Customer X as Export Price Sales

Plaintiffs contend that Commerce's reliance on Kangtai's sales to Customer X, which operates in a third country, as a basis for export price is unsupported by substantial evidence because the parties are affiliated and Kangtai prevented Commerce from verifying the parties' relationship.[7] Pls.' Br. at 8–17.  Defendant responds that Commerce properly used Kangtai's sales to Customer X as export price sales because Commerce found Kangtai's responses to its questionnaires and supplemental questionnaire sufficient, and Commerce was able to verify Kangtai's statement and supporting documentation that it was unaffiliated with Customer X.  Def.'s Br. at 6.  For the reasons that follow, Commerce's decision is not supported by substantial evidence.

To calculate a respondent's dumping margin, Commerce determines the "amount by which the normal value exceeds the export price (or constructed export price)." 19 U.S.C. § 1673.  Export price is the price at which the subject merchandise is sold "outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).  Thus, Commerce may use sales to a purchaser operating in a third country as export price, so long as the purchaser is unaffiliated with the exporter and the purchase is for exportation to the United

---

[7] Plaintiffs argue both that Commerce's determination is unsupported by substantial evidence and that it is not in accordance with law.  See Pls.' Br. at 8.  The substance of Plaintiffs' arguments, however, contend that Commerce's determination is unsupported by substantial evidence rather than contrary to law.  See id. at 8–13.

States.  If, by contrast, Commerce identifies a sale to an affiliated purchaser, Commerce constructs the export price using the price at which the subject merchandise is first sold in the United States to a purchaser not affiliated with the producer or exporter.  See 19 U.S.C. § 1677a(b).

A purchaser is affiliated with the producer if, inter alia, the producer controls the purchaser.  See 19 U.S.C. § 1677(33)(G).  The statute provides that one party controls the other if it "is legally or operationally in a position to exercise restraint or direction over the other" party.  Id.  Commerce has found control where a principal-agent relationship exists between the producer and purchaser.  See, e.g., Engineered Process Gas Turbo-Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan, 62 Fed. Reg. 24,394, 24,403 (Dep't Commerce May 5, 1997) (notice of final determination of sales at less than fair value) ("Engineered Process Gas Turbo-Compressor Systems from Japan").  In determining whether a principal-agent relationship exists, Commerce maintains that no bright line test exists, id., and will consider "the totality of the circumstances surrounding the parties involved," Final Decision Memo at 5.  Commerce's analysis focuses on "whether it is agreed that the agent is to act primarily for the benefit of the principal, not for itself." Engineered Process Gas Turbo-Compressor Systems from Japan, 62 Fed. Reg. at 24,403.  Commerce considers a variety of factors, including (1) the foreign producer's role in negotiating prices with the downstream U.S. customers, (2) the extent to which the foreign producer interacts with such downstream customers, (3) the extent to which the purchaser maintains inventory of the product, (4) whether the purchaser takes title to shipments and accepts the risk of loss, (5) the extent to which the purchaser further processes the goods

or adds value, (6) the methods of marketing a product by the producer to the U.S. customer in the pre-sale period, and (7) whether identification of the producer on the sales documentation implies an agency relationship during the transactions. See Steel Threaded Rod from India, 79 Fed. Reg. 9,164 (Dep't Commerce Feb. 18, 2014) (preliminary determination of sales at less than fair value, affirmative preliminary determination of critical circumstances, in part, and postponement of final determination) and accompanying Decision Mem. for the Prelim. Determination of the [ADD] Investigation of Steel Threaded Rod from India at 14–15, A-533-855, (Feb. 10, 2014), available at https://enforcement.trade.gov/frn/summary/india/2014-03483-1.pdf (last visited June 7, 2019) ("Steel Threaded Rod from India").

Commerce fails to support with substantial evidence its determination that Kangtai and Customer X are unaffiliated within the meaning of 19 USC § 1677a. Commerce bases its determination that Kangtai and Customer X are unaffiliated upon Kangtai's statements that it was not affiliated with Customer X and on "record evidence supporting this statement."[8] Final Decision Memo at 4. Id. Although the two entities may lack a formal corporate affiliation, Commerce's determination that the two are not affiliated through a principal-agent relationship is not supported by substantial evidence.

Of the seven factors mentioned in Steel Threaded Rod from India, Commerce relies on the foreign producer's role in negotiating and whether the purchaser takes title to the goods. See Final Decision Memo at 5. Commerce invokes Kangtai's statement

---

[8] It is reasonably discernible that Commerce is referring to Kangtai's statement that Customer X is an unaffiliated customer, and that Kangtai company officials provided Commerce with documentation from the "Hong Kong Integrated Companies Registry Information System" that identified [[         ]]. See Kangtai Verification Report at 2, CD 135, bar code 3642610-01 (Nov. 17, 2017) ("Kangtai Verification Report").

that it played no role in negotiations between Customer X and Customer X's U.S. customers, and notes that its examination of Kangtai's sales traces and accounting and sales records identified Customer X as the importer of record that took title to the products upon importation and paid Kangtai for these sales.  Id.; see also Kangtai Suppl. Sections A, C, & D Resp. at 2, CD 58–61, bar code 3563243-01 (Apr. 14, 2017).  Commerce, however, concedes that Customer X never maintained an inventory of the goods, did not further process the goods, and that Kangtai shipped directly to U.S. customers, with the bill of lading identifying Kangtai as the supplier.  Final Decision Memo at 5; Kangtai's Section A Resp. at Ex. A-8, CD 8–10, bar code 3523067-01 (Nov. 16, 2016).  Moreover, the record shows that Kangtai's sales representatives attended trade shows to identify U.S. customers, that Kangtai "sets the prices of the merchandise under consideration through direct negotiation with its U.S. customers," and that its U.S. customers "arrive at a mutual agreement on the price and then . . . sign a sales contract or place orders with Kangtai."  Kangtai's Section A Resp. at 7, 15, CD 8–10, bar code 3523067-01 (Nov. 16, 2016).  Commerce has not adequately explained its determination that the two entities are unaffiliated in light of such evidence under a totality of the circumstances test.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (explaining that substantial evidence "must take into account whatever in the record fairly detracts from its weight").

Commerce has also failed to adequately analyze the relevant factors or the record evidence impacting the inquiry of whether a principal-agent relationship exists.  Indeed, Commerce provides no analysis of whether identification of the producer on the sales documentation implies an agency relationship during the transactions.  See Steel Threaded Rod from India at 14–15; see also Final Decision Memo at 5.  At oral argument,

Defendant averred that Commerce addressed whether the identification of the producer on the sales documentation implied an agency relationship, Oral Arg. at 00:23:40–00:24:18, noting that in its determination Commerce stated that "our examination during verification of Kangtai's sales traces and accounting and sales records all identified Customer X as the importer of record." Final Decision Memo at 5. This statement does not substitute for an analysis of whether the sales documentation reveals an agency relationship. Further, although Customer X takes title, the record contains no evidence concerning when Customer X takes title or when title is transferred to its downstream customers, nor does it address the details of payments to and from Customer X.[9] Commerce also neglects to analyze the methods of marketing, the sixth factor listed above. See Final Decision Memo at 3–5.[10] This factor seems highly relevant here, given

---

[9] Petitioners in the proceeding below requested that Commerce ask Kangtai for some of this information, but Commerce elected not to do so. See Petitioners' Comments on Kangtai's Sections A, C, & D Resps. at 2–3, CD 44, bar code 3549988-01 (Mar. 9, 2017) (asking whether Customer X takes title to the merchandise, and whether Customer X pays Kangtai for the merchandise before [[                                                                                    ]]). Examples of sales contracts submitted during verification include payment terms requiring payment from Customer X within one month of receipt of goods by Customer X's customer. See EP Sales Spot-Selected Package [attached as Ex. VE-11 to Kangtai Verification Report] at 2, CD 135, bar code 3626629-12 (Nov. 17, 2017). Commerce provides no analysis, however, of such payment terms or the payment details related to transactions between Customer X and its customers.

[10] At oral argument, Defendant noted that Commerce need not examine the same factors in each case, or all the factors it may have used in the past but averred that Commerce considered all the factors in this case. Oral Arg. at 00:16:35–00:17:25. Defendant argued that Commerce analyzed the means of marketing, Oral Arg. at 00:23:15–00:23:35, noting Commerce's statement that "our examination of the [sic] Kangtai's financial statements, sales contract, bill of lading, and payment records during verification, confirmed that Kangtai played no role in communicating with the ultimate downstream customers of Customer X." Final Decision Memo at 5. The inference that Kangtai played no role in marketing the goods is unreasonable as it fails to consider Kangtai's own statement that it attends trade shows and the record evidence demonstrating that it marketed to and negotiated with customers at trade shows. See Kangtai Verification Report at 2 (revealing that Kangtai met Customer X at [[                                    ]]. Commerce must address this evidence. Although

(footnote continued)

that Commerce acknowledges that Kangtai attends trade shows in the United States but seems not to reflect upon the fact that Kangtai finds and interacts with—and presumably markets to—potential U.S. customers at these trade shows. See Kangtai's Section A Resp. at 15, CD 8–10, bar code 3523067-01 (Nov. 16, 2016); see also Kangtai Verification Report at 2, CD 135, bar code 3642610-01 (Nov. 17, 2017) ("Kangtai Verification Report").[11] Kangtai asserts that Customer X is merely "its customer in the normal business of operation" and that Kangtai played no role in negotiating with Customer X's U.S. customers, see Kangtai Suppl. Sections A, C, & D Resp. at 2, CD 58–61, bar code 3563243-01 (Apr. 14, 2017), but Commerce seems to take the statement at face value despite record evidence potentially detracting from this conclusion.[12] Ultimately, it is undisputed that Customer X proved responsible for more than [[    ]] of Kangtai's U.S. sales during the period of review. See SAS Data File [attached as Ex. SQ1-1 to] Kangtai's Suppl. Sections A, C, & D Resp., CD 62, bar code 3563243-01 (Apr. 14, 2017). The record is silent regarding the events leading up to Kangtai securing such

---

analysis of a limited number of discrete factors may clearly establish the existence or the lack of a principal-agent relationship in some cases, Commerce must nonetheless support each determination with substantial evidence on the record of each case. 19 U.S.C. § 1516a(b)(1)(B)(i). Here, the record evidence analyzed by Commerce does not reasonably support its determination.

[11] Indeed, Kangtai met Customer X at [[                              ]] and began selling subject merchandise to Customer X [[                    ]]. See Kangtai Verification Report at 2.

[12] Specifically, Commerce provides no analysis regarding whether any of Customer X's customers were [[                                                       ]], and thus could have received marketing from or negotiated with Kangtai. The fact that [[
                          ]], and that Customer X is a trader of pool chemicals, see Huaidong Aff. [attached as Ex. A-4 to Kangtai's Section A Resp.] at 1, CD 8–10, bar code 3523067-01 (Nov. 4, 2016), both suggest that Customer X sought to find U.S. customers, much like Kangtai. These facts reasonably lead to an inference that Kangtai could have marketed to companies that ultimately purchased from Customer X. Commerce must address such record evidence to support its determination by substantial evidence.

a commitment from Customer X, and given that the two [[

]], it is conceivable that Kangtai made efforts to market to those same customers who in the end purchased Kangtai's goods through Customer X.  Such insight would seemingly prove critical to Commerce's agency analysis, but the court is left to speculate.  Although it is not this court's role weigh the evidence, such unaddressed evidence on the record exposes Commerce's failure to analyze this factor as problematic.

In sum, Commerce presents no analysis of factors that seem critical under the circumstances, or of record evidence detracting from its determination.[13]  Without more evidence supporting its determination, or an explanation after at least considering all the relevant factors, Commerce's conclusion that Customer X and Kangtai are unaffiliated is unreasonable.[14]

---

[13] In its Final Decision Memo, Commerce seems to acknowledge that further inquiry is needed to properly address the potential existence of a principal-agent relationship.  After asserting that Petitioners first alleged a principal-agent relationship a few days before verification, Commerce states that "[g]iven the gravity of the petitioners' allegation, however, where Kangtai is selected as a mandatory respondent in future reviews, Commerce intends to further examine potential principal-agent relationships."  Final Decision Memo at 5.  This statement's implication is that Commerce would have conducted a more thorough investigation had it focused on the issue earlier.  Customer X's potential affiliation with Kangtai was properly before Commerce, and Commerce's determination must be supported by substantial evidence.

[14] Plaintiffs argue that in reaching its determination, Commerce should have applied adverse facts available pursuant to 19 U.S.C. § 1677e and found affiliation because "Kangtai prevented verification of its submitted data."  Pls.' Br. at 15–17.  Specifically, Plaintiffs contend that "[i]t was 'necessary' for Commerce to determine the relationship between Kangtai and [Customer X] because . . . that relationship dictates which sales and what expenses should be used in Commerce's dumping margin calculation."  Id. at 16.  The implication is that Commerce was missing necessary information, specifically, evidence revealing the nature of the relationship between Kangtai and Customer X, and that Commerce should have applied an adverse inference in selecting from available information to determine export price, given Kangtai's purported lack of cooperation in Commerce's verification.  See 19 U.S.C. § 1677e.  The court does not reach the argument because on the current record, Commerce has not supported its determination by substantial evidence that Kangtai and Customer X were unaffiliated.  Nonetheless, it seems clear on the current record that an adverse inference pursuant to 19 U.S.C. § 1677e(b) would be

(footnote continued)

      Defendant laments that "at no point [did Petitioners] allege . . . a principal-agent relationship between Kangtai and Customer X" in the proceeding below. Def.'s Br. at 9. Commerce noted, by contrast, that "[P]etitioners first alleged a principal-agent relationship . . . a few days before verification," and reasoned that, consequently, "Commerce was not in a position to seek additional information from Kangtai, nor Customer X, concerning this issue." Final Decision Memo at 4. During oral argument, counsel for Defendant averred that Defendant was not arguing that Plaintiffs failed to exhaust their administrative remedies. Oral Arg. at 00:25:40-00:26:05; see also 28 U.S.C. § 2637(d). It is thus unclear for what reason Commerce and Defendant characterize the timing of Petitioners' principal-agent allegation. Nevertheless, to the extent that Defendant describes the timing in an effort to excuse Commerce from conducting a more thorough investigation, Defendant's argument falls short. Petitioners first raised the issue before Commerce in their March 9, 2017 deficiency comments, six months prior to verification. See Petitioners' Comments on Kantai's Sections A, C, & D Resps. at 2–3, CD 44, bar code 3549988-01 (Mar. 9, 2017). There, Petitioners requested that Commerce ask Kangtai several follow-up questions probing the nature of Kangtai's relationship with Customer X. The questions speak directly to the possibility of a principal-agent relationship, inquiring whether

---

unwarranted, considering that Kangtai supplied the information requested by Commerce. See 19 U.S.C. § 1677e(b) (providing that Commerce may apply an adverse inference upon a finding that an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information"); see also Prelim. Decision Memo at 2 (stating that Kangtai responded in a timely manner to Commerce's ADD questionnaires). Application of an adverse inference is a two-step process: (1) Commerce must find that necessary information is missing from the record, and (2) Commerce must find that an interested party failed to cooperate. See 19 U.S.C. § 1677e. Here, Commerce found neither of these elements. On remand, however, the possibility remains that Commerce could find that necessary information is missing from the record pursuant to 19 U.S.C. § 1677e(a), in which case Commerce could be within its statutory authority to apply "facts otherwise available," and then determine whether an adverse inference is warranted, pursuant to 19 U.S.C. § 1677e(b), based on the cooperation of the parties.

Customer X "hold[s] itself out or otherwise function[s] as a sales agent of Kangtai." Id. at 3. The submission also contained questions directed specifically at Commerce's principal-agent factors. For example, Petitioners wanted Commerce to inquire about Customer X's role, whether Customer X [[

]], whether Customer X took title to the merchandise and purchased and stored the merchandise in inventory, when Kangtai receives payment for the merchandise from Customer X, and the extent to which Customer X negotiates sales terms with its U.S. customers prior to finalizing sales terms with Kangtai. See id. at 2–3. It was thus clear that Kangtai and Customer X's potential affiliation was at issue.

Defendant attempts to draw a distinction between making an allegation to Commerce versus proposing questions for a supplemental questionnaire, implying that the former is necessary for Commerce to investigate the matter. Oral Arg. at 00:34:11–00:35:00. Such a distinction has no basis in statute or regulation. To the contrary, the statutory language requires a determination of non-affiliation, supported by substantial evidence to determine export price under 1677a(a). See 19 U.S.C. § 1677a(a) (defining "export price" as "the price at which the subject merchandise is first sold . . . outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States"); see also 19 U.S.C. § 1516a(b)(1)(B)(i) (Commerce's findings must be supported by substantial evidence on the record). Accordingly, Defendant's arguments regarding the timing of the purportedly necessary allegation are unpersuasive.

## II. Commerce's Decision to Use Heze Huayi's Labor Usage Rates

Plaintiff contends that Commerce's decision to accept Heze Huayi's labor usage rates for the period of review is unsupported by substantial evidence and unlawful because the data is "unreasonable and unrealistic" compared to labor usage rates verified by Commerce for the 2013–2014 review and rates used in the 2014–2015 review, and because Commerce's practice is to reject such data. Pls.' Br. at 17. Defendant responds that Commerce's decision is supported by substantial evidence and in accordance with law because Heze Huayi complied with all requests for labor data, Commerce reasonably relied on Heze Huayi's data, and Commerce did not deviate from its practice in this case. Def.'s Br. at 13–15. For the reasons that follow, Commerce's decision to use Heze Huayi's labor usage rates is supported by substantial evidence and in accordance with law.

As discussed, Commerce determines a respondent's dumping margin by calculating the difference between normal value and export price (or constructed export price) of the merchandise. 19 U.S.C. § 1673. In cases involving non-market economies ("NME"), Commerce determines the normal value of the merchandise based on the "factors of production utilized in producing the merchandise" if the merchandise is exported from an NME, and the information does not permit calculation of normal value using home-market prices, third-country prices, or constructed value pursuant to 19 U.S.C. § 1677b(e). See 19 U.S.C. § 1677b(c). Commerce bases normal value on FOPs in NME cases "because the presence of government controls on various aspects of these economies renders price comparisons and the calculation of production costs invalid under the Department's normal methodologies." Prelim. Decision Memo at 17. In NME

cases, Commerce uses surrogate values to value the FOPs.[15]  See 19 U.S.C. § 1677b(c). To determine normal value, Commerce multiplies the respondents' reported per-unit factor quantities by the chosen surrogate values.  See Prelim. Decision Memo at 17.  The hours of labor required to produce the subject merchandise is one FOP identified by statute.  19 U.S.C. § 1677b(c)(3)(A).

Here, Commerce's use of Heze Huayi's labor usage rates in its determination of the value of Heze Huayi's normal value is supported by substantial evidence.  Plaintiffs do not dispute that Heze Huayi provided labor schedules identifying the number of workers and working days by production plant, labor cost calculation worksheets tied to its salary payable ledger, copies of the ledger for the sample months requested by Commerce, and complete payroll sheets.  See Direct & Indirect Labor Schedule [attached as Ex. SQ1-24 to Heze Huayi Suppl. Sections A, C, & D Questionnaire Resp.], CD 45–48, bar code 3553345-03 (Mar. 20, 2017); Labor Cost Calculation in Normal Course of Accounting [attached as Ex. SQ1-25 to Heze Huayi Suppl. Sections A, C, & D Questionnaire Resp.], CD 45–48, bar code 3553345-03 (Mar. 20, 2017); see also Reply Br. of [Pls.] at 10–13, Nov. 20, 2018, ECF No. 37.  Commerce found no fault with respect to Heze Huayi's reported labor usage rates despite Plaintiffs' contention that Heze Huayi's

---

[15] Commerce uses "the best available information" from a market economy considered appropriate to value FOPs.  19 U.S.C. § 1677b(c)(1).  Commerce selects information, to the extent practicable, that is publicly available, product specific, tax and import duty exclusive, contemporaneous with the period of review, and representative of a broad market average.  Qingdao Sea–Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited June 7, 2019) ("Policy Bulletin 04.1"); Certain Frozen & Canned Warmwater Shrimp from the Socialist Republic of Vietnam, 69 Fed. Reg. 42,672 (Dep't Commerce July 16, 2004) (notice of prelim. determination of sales at less than fair value, negative preliminary determination of critical circumstances and postponement of final determination).

labor rates are "inconsistent with its previously submitted labor usage rates" and are thus unreasonable. Pls.' Br. at 17. That labor usage diverged from previous reviews does not make the data "unreasonable and unrealistic."[16] It is reasonably discernible that Commerce concluded that Heze Huayi improved its labor usage from the past reviews. Commerce noted that nothing in the record supports the allegation that Heze Huayi's production process is "mature and well-established," as Petitioners argued in the proceeding below.[17] Final Decision Memo at 6. Moreover, although Commerce did not verify Huayi's labor usage data in this review,[18] it verified that of Kangtai, a direct

---

[16] Plaintiffs also argue that Commerce's determination is contrary to law because Commerce failed "to address the record evidence and arguments demonstrating that Heze Huayi's reported data are unreasonable." Pls.' Br. at 20. The argument cannot withstand scrutiny. Plaintiffs did not raise a concern regarding the adequacy of Heze Huayi's reported data through the submission of deficiency comments. To the extent that Plaintiffs claim that "inconsistent usage data from the previous segments of the proceeding" detracts from Commerce's determination, however, it is reasonably discernible that Commerce found that Heze Huayi's production process improved. Id. Commerce specifically noted that Petitioners alleged that Heze Huayi's production process was "mature and well-established," but Commerce concluded that the record lacked evidence supporting Petitioners' assertion. Final Decision Memo at 6.

[17] Plaintiffs argue that, "despite no changes to Heze Huayi's method of producing chlorinated isos," Heze Huayi's labor usage rates changed and are "unreasonable and unrealistic" compared to its rates in the previous two reviews. Pls.' Br. at 17–19. First, Plaintiffs cite nothing in the record supporting their contention that Heze Huayi made no changes to its production methods. See id. at 18. To the contrary, record evidence indicates that, if anything, Heze Huayi likely made improvements to its production methods leading up to the current period of review, as did its industry competitor, Kangtai. See Kangtai Verification Report at 3, 8.

[18] Plaintiffs' argument seems, in part, to be that Commerce should have verified Heze Huayi's labor usage data. See Reply Br. of [Pls.] at 11, Nov. 20, 2018, ECF No. 37 ("Commerce opted not to verify Heze Huayi, or its data."). Commerce was under no obligation to verify the data, however, because Heze Huayi's labor usage rates were verified in the 2013–2014 review. See 19 U.S.C. § 1677m(i)(3) (stating that Commerce shall verify information relied upon in a final determination in an administrative review where verification is timely requested and no verification was made under the two immediately preceding reviews). If Plaintiffs felt the data submitted by Heze Huayi was deficient, they could have filed deficiency comments asking Commerce to issue follow-up questions to Heze Huayi and examine the labor usage rates in greater detail. See 19 U.S.C. § 1677m(g) (providing that information submitted to Commerce during a proceeding is subject to comment by other parties); see also 19 U.S.C. § 1677m(d) (explaining the required

(footnote continued)

competitor to Heze Huayi that also reported improved labor usage.[19]  See Kangtai Verification Report at 3, 8.  Commerce's verification revealed that Kangtai recently upgraded its production equipment to increase efficiency and reduce material waste.  Id.  Further, it revealed that Kangtai continues to upgrade its production process in ways that would conceivably drive more efficient labor usage.[20]  Id. at 8.  It is reasonably discernible that Commerce, in using Heze Huayi's data, concluded that Heze Huayi made similar upgrades for the current period of review.  Such record evidence provides a rational explanation for the divergence, and Commerce's decision to use Heze Huayi's rates was therefore reasonable.[21]  The court will not reweigh the evidence.  See Downhole Pipe &

---

procedure for when a party submits information deemed deficient).  They did not do so, see Final Decision Memo at 7, and the court will not reweigh Commerce's verification decisions nor the validity of Heze Huayi's labor usage data, a factual matter decided by the agency.  See Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (explaining that the courts are "ill-suited" to be "routinely second-guessing the Secretary's decisions regarding whether to conduct verification in particular cases" as doing so "could be quite disruptive of Commerce's effort to establish enforcement priorities").

[19] Section 1677m(i) nonetheless provides for verification where "good cause for verification is shown," but nothing in the record indicates that Commerce made a finding of good cause, nor did the Plaintiffs pursue an argument that good cause existed before this court.  Oral Arg. at 01:24:35–01:25:28.  Accordingly, the court will not second-guess Commerce's verification decisions in this case.  See Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)  (holding that Commerce's determination that the Secretary has "substantial discretion" in deciding whether good cause for verification is shown is a reasonable interpretation of the statute); see also Heckler v. Chaney, 470 U.S. 821, 832 (1985) (noting that practical concerns regarding the unsuitability of judicial review form the basis for the principle of administrative law that courts generally will defer to the agency's procedures it adopts for implementing the statute it is charged with administering).

[20] Specifically, it upgraded its equipment by [[                                                                                 ]].  See Kangtai Verification Report at 8.

[21] Plaintiffs argue in their reply brief that Kangtai's production flowchart is [[                    ]] since the 2010–2011 review period, that Heze Huayi's production flowchart is [[         ]], and that the [[                                            ]] makes it improbable that any change would result in Heze Huayi's labor usage rates.  Reply Br. of [Pls.] at 12, Nov. 20, 2018, ECF No. 37.  This argument falls short given that Kangtai made changes to its production process that Commerce verified, see Kangtai Verification Report at 3, 8, and yet its production flowchart was

(footnote continued)

Equipment, L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015) (explaining that the court's task is not to reweigh the evidence).

Plaintiffs argue that Commerce's decision to use Heze Huayi's labor usage data is unlawful because it runs contrary to Commerce's practice. Pls.' Br. at 20. Plaintiffs invoke Fresh Garlic from [the PRC] as an example of a determination in which Commerce rejected information that appeared to be unrealistic in light of other information on the record. Id. (citing Fresh Garlic from [the PRC], 70 Fed. Reg. 34,082 (Dep't Commerce June 13, 2005) (final results of [ADD] administrative review) and accompanying Issues and Decision Mem. for the Administrative Review of the [ADD] Order on Fresh Garlic from [the PRC], A-570-831, (June 13, 2005), available at https://enforcement.trade.gov/frn/summary/prc/E5-3048-1.pdf (last visited June 7, 2019) ("Fresh Garlic from the PRC")). Plaintiffs' comparison to Fresh Garlic from the PRC misses the mark. There, Commerce applied partial adverse facts available because it found that two respondents "reported untimely, contradictory, and confusing information with respect to factors pertaining to herbicide usage, and with respect to growing and harvesting FOPs." Fresh Garlic from the PRC at 59. Commerce specifically noted that these two respondents reported garlic yields that appeared unrealistic in light of their own reported factor input levels, information provided by their own experts, and the growing and harvesting experience of the other respondents. Id. Such factors are not present here. As discussed, it is undisputed that Heze Huayi complied with Commerce's requests

---

[[                    ]] from the 2010–2011 review period. See Petitioners' Case Br. at 11, CD 136, bar code 3646203-01 (Nov. 29, 2017) (citing Kangtai Production Flowchart [attached as Ex. D-1 to Kangtai Sections C & D Resp.], CD 16, bar code 3528720-02 (Dec. 9, 2016)). It is therefore perfectly conceivable that Heze Huayi could have made changes to its production methods that did not appear in its flowchart yet resulted in a change to its labor usage rates.

for information by providing its direct and indirect labor schedule for the period of review, which identified the number of workers and working days by production plant, a labor cost calculation worksheet tied to its salary payable ledger, including copies of the ledger for sample periods requested by Commerce, and its complete payroll sheet for December 2015.  Final Decision Memo at 7; see also Direct & Indirect Labor Schedule [attached as Ex. SQ1-24 to Heze Huayi Suppl. Sections A, C, & D Questionnaire Resp.], CD 45–48, bar code 3553345-03 (Mar. 20, 2017); Labor Cost Calculation in Normal Course of Accounting [attached as Ex. SQ1-25 to Heze Huayi Suppl. Sections A, C, & D Questionnaire Resp.], CD 45–48, bar code 3553345-03 (Mar. 20, 2017).  Commerce made no finding that Heze Huayi's responses were untimely, inconsistent with other record information, or confusing, unlike the responses in Fresh Garlic from the PRC.  To the contrary, Heze Huayi complied with Commerce's requests, and Commerce found no discrepancies with respect to Heze Huayi's responses to the original and supplemental questionnaires.  Moreover, unlike Fresh Garlic from the PRC, where the respondents' yields appeared unrealistic in light of other respondents' experiences, Heze Huayi's competitor—Kangtai—also showed significantly improved labor usage rates.  See Comparison of Kangtai's Usage Rates from 10th to 11th Administrative Reviews [attached as Ex. 5 to Petitioners' Dec. 21, 2016 Fact Submission], CD 40, bar code 3531469-02 (Dec. 21, 2016).  Accordingly, Commerce's determination is in accordance with law.

## CONCLUSION

Commerce's determination to use Kangtai's sales to Customer X as export price sales is not supported by substantial evidence.  Commerce's determination to use Heze Huayi's reported labor usage rates in its calculation of Heze Huayi's normal value is

supported by substantial evidence and in accordance with law.  Therefore, in accordance with the foregoing, it is

**ORDERED** that this action is remanded to Commerce for reconsideration or additional explanation with respect to its decision to use Kangtai's sales to Customer X as export price sales; and it is further

**ORDERED** that Commerce's <u>Final Results</u> are sustained with respect to Commerce's decision to use Heze Huayi's reported labor usage rates in its calculation of Heze Huayi's normal value; and it is further

**ORDERED** that Commerce shall file its remand results in 90 days; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file their replies to comments on the remand determination.

      /s/ Claire R. Kelly
    Claire R. Kelly, Judge

Dated: June 12, 2019
      New York, New York