Slip Op. 20-24

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BIO-LAB, INC. ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD., <br><br> Defendant-Intervenors. | Before: Claire R. Kelly, Judge <br><br> Court No. 18-00051 <br> **PUBLIC VERSION** |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand redetermination in the 2015–2016 administrative review of the antidumping duty order on chlorinated isocyanurates from the People's Republic of China.]

Dated: February 26, 2020

James R. Cannon, Jr., Jonathan M. Zielinski, and Ulrika K. Swanson, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for plaintiffs Bio-Lab, Inc., Clearon Corporation, and Occidental Chemical Corporation.

Joseph H. Hunt, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Sonia M. Orfield, Trial Attorney. Of Counsel on the brief was Jessica Link, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, for defendant-intervenors Heze Huayi Chemical Co., Ltd. and Juancheng Kangtai Chemical Co., Ltd., of Washington, D.C.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce" or "Department") remand redetermination filed pursuant to the court's order in Bio-Lab, Inc. v. United States, 43 CIT __, 392 F. Supp. 3d 1264 (2019) ("Bio-Lab I"). See also Redetermination Pursuant to Ct. Remand Order, Oct. 11, 2019, ECF No. 75 ("Remand Results"). In Bio-Lab I, the court sustained in part and remanded in part Commerce's final determination in the 2015–2016 administrative review of the antidumping duty ("ADD") order on chlorinated isocyanurates from the People's Republic of China ("PRC"). See Chlorinated Isocyanurates From the [PRC], 83 Fed. Reg. 5,243 (Dep't Commerce Feb. 6, 2018) (final results of [ADD] administrative review; 2015–2016) ("Final Results") and accompanying Decision Memo. for the Final Results of [ADD] Administrative Review: Chlorinated Isocyanurates from [the PRC]; 2015–2016, A-570-898, Jan. 29, 2018, ECF No. 25-5 ("Final Decision Memo").

Plaintiffs Bio-Lab, Inc., Clearon Corporation, and Occidental Chemical Corporation (collectively "Plaintiffs") challenge Commerce's remand redetermination as unsupported by substantial evidence. See Pls.' Cmts. Opp'n Commerce's Remand Results at 1–6, Nov. 12, 2019, ECF No. 77 ("Pls.' Br."). Defendant and Defendant-Intervenors Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and Heze Huayi Chemical Co., Ltd. (collectively, "Defendant-Intervenors") request the court to uphold the Remand Results. See Def.'s Resp. [Pls.' Br.], Dec. 12, 2019, ECF No. 81 ("Def.'s

Br."); Def.-Intervenors' Reply Cmts. Supp. Commerce's Remand Redetermination, Dec. 12, 2019, ECF No. 83 ("Def.-Intervenors' Br."). For the following reasons, the court sustains Commerce's Remand Results.

## BACKGROUND

The court assumes familiarity with the facts of this case, as set out in the previous opinion, see Bio-Lab I, 43 CIT at __, 392 F. Supp. 3d at 1266–67, and recounts those relevant to the court's review of the Remand Results. In the final results of this administrative review of the ADD order on chlorinated isocyanurates,[1] Commerce relied on Kangtai's sales to Customer X,[2] a purchaser operating in a third-country, as export price ("EP") sales. See Final Decision Memo. at 4. Commerce found that Kangtai's sales were the first sales made to an unaffiliated party outside of the United States. Id. To reach this conclusion, Commerce evaluated factors that signpost the existence of a principal-agent relationship ("affiliation"). See id. at 5. Commerce focused its analysis on Kangtai's statements that it was not affiliated with Customer X pursuant to 19 U.S.C. § 1677(33) and record evidence supporting that position. See id. at 4–5.

---

[1] This administrative review covers the period June 1, 2015 through May 31, 2016. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 53,121, 53,122 (Dep't Commerce Aug. 11, 2016).

[2] Customer X is [[                                                        ]].

In Bio-Lab I, the court ordered Commerce to reconsider or further explain its reliance on Kangtai's sales to Customer X as EP sales, because Commerce failed to consider all relevant factors bearing on an affiliation determination, to adequately analyze the record evidence, and ultimately to support its determination with substantial evidence. See 43 CIT at __, 392 F. Supp. 3d at 1267–72, 1276. Specifically, the court faulted Commerce for exclusively relying on two factors in reaching its determination, and, further, for not considering detracting evidence in its analysis of those factors. See id., 43 CIT at __, 392 F. Supp. 3d at 1269–71. Therefore, given that Commerce had not analyzed all relevant factors or considered detracting evidence, the court concluded that "[w]ithout more evidence supporting its determination, or an explanation after at least considering all relevant factors," Commerce's finding that the two entities were unaffiliated was unreasonable. Id. 43 CIT at __, 392 F. Supp. 3d at 1271. On remand, Commerce continues to find no principal-agent relationship exists between Kangtai and Customer X and treats Kangtai's sales as EP sales in the calculation of normal value. See Remand Results at 1–2.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012),[3] which grant the court authority to review actions contesting

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

the final determination in an administrative review of an ADD order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

Plaintiffs challenge as unsupported by substantial evidence Commerce's decision on remand to rely on Kangtai's sales to Customer X as EP sales, because necessary evidence is missing from the record for Commerce to conclude Kangtai and Customer X are unaffiliated. See Pls.' Br. at 5–14. Plaintiffs contend that Commerce's determination is unreasonable because Commerce did not collect more information and does not offer new substantive explanations on remand. See id. at 1–5. Defendant and Defendant-Intervenors respond that Commerce complied with the court's order by re-examining the relationship between Kangtai and Customer X based on all factors that signpost the existence of a principal-agent relationship, and, in doing so, Commerce reasonably finds that the record evidence indicates an absence of a principal-agent relationship. See Def.'s Br. at 5–15; Def.-Intervenors' Br. at 1–

11. For the reasons that follow, Commerce reasonably concludes that Kangtai and Customer X were not in a principal-agent relationship.

To calculate a respondent's dumping margin, Commerce determines the "amount by which the normal value exceeds the [EP] (or constructed export price) for the merchandise." 19 U.S.C. § 1673. Export price is the price at which the subject merchandise is sold "outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." Id. at § 1677a(a). Thus, Commerce may use sales to a purchaser operating in a third country as EP sales, so long as the purchaser is unaffiliated with the exporter and the purchase is for exportation to the United States. Otherwise, if that purchaser and exporter are affiliated, Commerce determines a constructed EP using the price at which the subject merchandise is first sold in the United States to a purchaser not affiliated with the producer or exporter. See id. at § 1677a(b).

A purchaser is affiliated with the producer if, inter alia, the producer controls the purchaser. See 19 U.S.C. § 1677(33)(G). The statute provides that one party controls the other if it "is legally or operationally in a position to exercise restraint or direction over the other" party. Id. Commerce has found control where a principal-agent relationship exists between the foreign producer and purchaser. See, e.g., Engineered Process Gas Turbo-Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan, 62 Fed. Reg. 24,394, 24,403 (Dep't Commerce May 5, 1997) (notice of final determination of sales

at less than fair value) ("Engineered Process Gas"). In determining whether a principal-agent relationship exists, no bright line test exists, id., and Commerce will consider the totality of the circumstances. See Remand Results at 18.

To do so, Commerce considers a variety of factors, probative of a foreign producer's interaction with downstream U.S. customers and the purchaser's control over merchandise, that guide an analysis of whether the foreign producer, as a principal, restrains or directs the purchaser, as its agent. Those factors include: (1) the foreign producer's role in negotiating prices with the downstream U.S. customers, (2) the extent to which the foreign producer interacts with such downstream customers, (3) the extent to which the purchaser maintains inventory of the product, (4) whether the purchaser takes title to goods, (5) the extent to which the purchaser further processes the goods or adds value, (6) the methods of marketing a product by the producer to the U.S. customer in the pre-sale period, and (7) whether identification of the producer on the sales documentation implies an agency relationship during the transactions (collectively, "India Threaded Rod factors" or "factors"). See Steel Threaded Rod from India, 79 Fed. Reg. 9,164 (Dep't Commerce Feb. 18, 2014) (prelim. determination of sales at less than fair value, affirmative prelim. determination of critical circumstances, in part, and postponement of final determination) and accompanying Decision Memo. for the Prelim. Determination of the [ADD] Investigation of Steel Threaded Rod from India at 14–15, A-533-855, (Feb. 10, 2014), available at https://enforcement.trade.gov/frn/summary/india/2014-03483-

1.pdf (last visited Feb. 21, 2020) ("India Threaded Rod Decision Memo."). Commerce's analysis focuses on "whether it is agreed that the agent is to act primarily for the benefit of the principal, not for itself." Engineered Process Gas, 62 Fed. Reg. at 24,403.

On remand, Commerce reasonably determines that Kangtai and Customer X were unaffiliated. In Bio-Lab I, the court ordered Commerce to reconsider or further explain its reliance on Kangtai's sales to Customer X as EP sales, because Commerce failed to adequately analyze the record evidence and support its determination. See 43 CIT at __, 392 F. Supp. 3d at 1267–72, 1276. Although Commerce could have reopened the record on remand, Commerce declined to do so, and makes its determination by analyzing the same record evidence and by offering further explanation. Remand Results at 20–22. Commerce recounts in detail why, in consideration of each of the seven India Threaded Rod factors, it continues to find a principal-agent relationship absent, from the totality of the circumstances. See id. at 5–19.

Although Commerce evaluates each India Threaded Rod factor sequentially, its analysis focused, in large part, on four factors that are probative of whether, and the extent to which, Kangtai interacted with downstream U.S. customers.[4] Unlike

---

[4] The four India Threaded Rod factors that examine a foreign producer's relationship

(footnote continued)

Court No. 18-00051                                                                                                                Page 9
**PUBLIC VERSION**

its analysis in the Final Results, Commerce, on remand, specifically considers record evidence concerning price negotiations, methods of marketing, and sales that corroborated Customer X's and Kangtai's statements that Kangtai's interactions with Customer X do not extend to the downstream U.S. customers of Customer X.[5] See Remand Results at 6–14.[6] Commerce examines Kangtai's sales trace and accounting documents, provided by Kangtai in its questionnaire and verification responses, which revealed how Customer X requests a price quote from Kangtai and then

---

with downstream U.S. customers are: the foreign producer's role in negotiating prices with the downstream U.S. customers, the extent to which the foreign producer interacts with such downstream customers, the methods of marketing a product by the producer to the U.S. customer in the pre-sale period, and whether identification of the producer on the sales documentation implies an agency relationship during the transactions. See Remand Results at 6–15.

[5] Commerce refers to Customer X's statement that it negotiates prices [[            ]] with Kangtai based on [[            ]] and Kangtai's statement that it "does not determine the ultimate customer or market." See Remand Results at 7 n.33 (citing Kangtai SQRA at 14, Ex. A-4; Kangtai Supp. Questionnaire Resp. at 2, CD 58–61, barcodes 3563243-01–04 (Apr. 14, 2017) (internal quotations omitted).

[6] By contrast, in its Final Decision Memo., Commerce did not engage with the record evidence and stated, without further explanation, that its "examination of the Kangtai's [sic] financial statements, sales contract, bill of lading, and payment records during verification[] confirmed that Kangtai played no role in communicating with the ultimate downstream customers of Customer X." See Final Decision Memo. at 5.  Similarly, Commerce noted that its "examination during verification of Kangtai's sales traces and accounting and sales records all identified Customer X as the importer of record that took title to the products upon importation and made payments to Kangtai for these U.S. sales." Id.  Given the paucity of analysis, this court observed that Commerce appeared to have taken Kangtai's statements of non-affiliation at "face value despite record evidence potentially detracting from this conclusion." Bio-Lab I, 43 CIT at __, 392 F. Supp. 3d at 1270.

negotiates with Kangtai to reach a mutually agreed price. Id. at 8 (citing Kangtai's Verification Report at VE-6–8, VE-11, CD 135, bar code 3642610-01 (Nov. 17, 2017) ("Kangtai Verification Report); Kangtai Section A Questionnaire Response at Ex. A-8, CD 8–10, bar codes 3523067-01–03 (Nov. 16, 2016) ("Kangtai SQRA")). Commerce reasons that such negotiations would be unnecessary if Kangtai were, as a principal, dictating the sales terms to Customer X, its agent. See id. at 10.[7] Commerce notes that the sales trace documents between Kangtai and Customer X—i.e., purchase orders, sales contracts, and invoices—reflect documentation typical of independently negotiated sales. Id. at 15–16. Further, the sales contracts and invoices do not refer to Customer X as an agent, indicate a commission, or reference sales revenue from Kangtai's downstream U.S. customers. Id. Although the sales documents provided to the downstream U.S. customer, specifically the bill of lading, identified Kangtai as the producer, Commerce explains that the identity of a producer on such documents

---

[7] By contrast, in India Threaded Rod, Commerce found a principal-agent relationship existed because the foreign producer negotiated directly with downstream U.S. customers and limited the purchaser's price negotiations. See India Threaded Rod Decision Memo at 17. Similarly, in Engineered Process Gas, Commerce determined that the foreign producer controlled the price, and other terms of sale, of the purchaser's transactions with downstream U.S. customers, by communicating with the downstream customer. See id., 62 Fed. Reg. at 24,403. Here, by contrast, Commerce did not find a "paper trail" reflecting a principal-agent relationship between Kangtai and Customer X. See Remand Results at 22.

does not, taken alone, indicate a principal-agent relationship.[8]  See id. at 15 (citing India Threaded Rod Decision Memo. at 57).  In consideration of the sales documents between Kangtai and Customer X as well as between Customer X and its downstream U.S. customer, Commerce reasonably infers that Kangtai did not direct, restrain, or control Customer X in its interactions with and sales to downstream U.S. customers.  Id.[9]

In addition, Commerce addresses the court's concern that Kangtai's U.S. customers encompassed Customer X's customers in its analysis of record evidence.  See Bio-Lab I, 43 CIT at __, 392 F. Supp. 3d at 1270–71.  Even though Kangtai had attended U.S. trade shows,[10] where customers of Customer X were also likely present,

---

[8] Specifically, the [[         ]] identifies Kangtai as the [[         ]], Customer X as the [[         ]], and another customer as [[         ]].  Given that Customer X made its sales on an [[         ]] basis, meaning that Customer X [[         ]], Remand Results at 13, [[         ]] would arrange shipping.  Therefore, the inclusion of another customer supports Commerce's inference that the sales documents do not suggest that Kangtai acts on Customer X's behalf.  See Remand Results at 15–16.

[9] Commerce considers that this factor "strongly weighs in favor" of finding no affiliation between Kangtai and Customer X.  Remand Results at 10.  Unlike India Threaded Rod and Engineered Process Gas, Commerce explains there was no evidence that Kangtai negotiated prices with downstream customers or that Kangtai controlled the prices Customer X charged to downstream customers.  See Remand Results at 11 (citing India Threaded Rod Decision Memo. at 15; Engineered Process Gas, 62 Fed. Reg. at 24,403).

[10] Kangtai explained that it had met Customer X at a trade show in [[         ]] and began selling to Customer X in [[         ]], during the POR.  See Kangtai Verification Report at 2.

Court No. 18-00051 Page 12
**PUBLIC VERSION**

Commerce finds that by comparing Kangtai's questionnaire responses listing its U.S. customers[11] with certain sales documentation identifying the ultimate shipment recipient, Kangtai's customers were not also the U.S. customers of Customer X.[12]  Id. at 8–9.  Therefore, the record evidence corroborates Kangtai's statement that it had no contact with Customer X's downstream U.S. customers.[13]  See Remand Results at 7–9 (citing Kangtai Supp. Questionnaire Resp. at 2, CD 58–61, barcodes 3563243-01–04 (Apr. 14, 2017)).  Commerce's review of the record evidence reasonably supports

---

[11] Kangtai reported [[   ]] other U.S. customers for the POR, [[   ]].  See Kangtai Sec. C & D Questionnaire Response at 8, CD 15, bar code 3528720-01 (Dec. 9, 2016).

[12] Commerce notes that sales documentation on the record identified [[   ]] as a customer of Customer X.  Remand Results at 9 (citing Kangtai SQRA at Ex. A-8; Kangtai Verification Report at VE-11).  However, Kangtai did not list [[   ]] as a U.S. customer in its questionnaire responses.  Id.

[13] Plaintiffs assert that Commerce does not address the India Threaded Rod factor concerning the foreign producer's role in negotiating price and other terms of sale, because Commerce focused on the definition of "U.S. customer."  See Pls.' Br. at 6–7.  However, Plaintiffs' argument elides the context in which Commerce discussed this term and discounts Commerce's further analysis.  In the Remand Results, Commerce points to Kangtai's verification report, where Commerce confirmed with Kangtai how it had defined "U.S. Customer," namely as a customer for sale for exportation to the United States, not a customer located in the United States.  Remand Results at 9 (citing Kangtai Verification Report at Ex. VE-9).  Commerce notes that irrespective of Kangtai's definition, it would not necessarily agree with that characterization, if there were contrary evidence.  Id. at 10.  Moreover, Commerce refers to record evidence—beyond the characterization of U.S. customer—discussed above, indicating that Kangtai did not direct or restrain Customer X in its price negotiations or terms of sale to Customer X's downstream U.S. customers.  See Remand Results at 7–11.

its inference that Kangtai did not play a role in, or direct, Customer X's identification of downstream U.S. customers or direct the terms of sale. See id. at 8.

Commerce also considers the remaining three India Threaded Rod factors, which are probative of whether Customer X exercised control over merchandise.[14] Based on sales records, Commerce finds that Customer X takes title to merchandise before it leaves Kangtai's factory.[15] Remand Results at 13, n.53 (citing Kangtai SQRA at Exs. 8, 14). However, Commerce observes that Customer X does not maintain inventory of Kangtai's products[16] and, further, does not process or add value to that

---

[14] The remaining factors are: whether the purchaser takes title to goods, the extent to which the purchaser maintains inventory of the product, and the extent to which the purchaser further processes the goods or adds value. See Remand Results at 13–14.

[15] Plaintiffs allege that Commerce fails to explain why payment was not tied to downstream delivery, when, of the two sales traces on record, Customer X had paid for one sale on time yet another sale [[         ]] later. See Pls.' Br. at 10. However, Commerce in its Remand Results does not consider the gap between delivery and payment dates to be significant. See Remand Results at 29. Commerce notes that the sales documents identified Customer X as the consignee, or the owner of the consignment to which title transfers. Id. Commerce also explains that, because sales were made [[         ]], title transfers to the consignee when the merchandise is claimed for delivery at Kangtai's factory. Id. at 28. Commerce therefore infers that the payment terms, under such an [[         ]] sale, required Customer X to pay within 30 days after the merchandise was picked up at Kangtai's factory. Id. In Commerce's view, this sales structure further suggests that Customer X was not a "go-through" of Kangtai, because it "owned" merchandise until delivery to its downstream customer. Id.

[16] Commerce also addresses the court's concern that the record "contains no evidence concerning when Customer X takes title or when title is transferred[.]" Bio-Lab I, 43 CIT at __, 392 F. Supp. 3d at 1269. On remand, Commerce explains that, although

(footnote continued)

Court No. 18-00051 Page 14
**PUBLIC VERSION**

merchandise. See Remand Results at 13–14. Although, as Commerce acknowledges, a lack of inventory may indicate that Customer X is an agent of Kangtai, Commerce explains that a lack of inventory could also evince a foreign producer-middle man relationship. See id. at 27. Commerce notes that not all foreign producers can find customers and negotiate sales abroad; instead, a foreign producer may sell to a middle man with its own customers. See id. Therefore, a middleman may elect to ship directly to its customers, without incurring the extra costs of warehousing goods. Id. As Commerce notes, it does not necessarily follow from such an arrangement that the price a middle man charges to its customers is one directed by the foreign producer. Id. In consideration of the totality of the circumstances, Commerce reasonably determines that its analysis of all India Threaded Rod factors and the record evidence weigh in favor of finding that Kangtai and Customer X were not affiliated. See id. at 18–19. The court cannot say this conclusion is unreasonable.[17]

---

the sales contract between Kangtai and Customer X requires payment [[          ]], the sales contract, along with the bill of lading, also indicates that the sales were made [[          ]], where Kangtai is responsible to make the merchandise available for pick-up by Customer X. See Remand Results at 16–17 (citing Kangtai Verification Report at Ex. VE-11; Kangtai SQRA at 5). Therefore, Commerce reasonably concludes that Customer X received merchandise, even if it did not physically take inventory, and paid for the merchandise after received, i.e., shipped. See id. at 16.

[17] Plaintiffs' contention that Commerce erroneously assigned certain India Threaded Rod factors less weight than others, and ignored others altogether, in its evaluation of the totality of the circumstances lacks merit. See Pls.' Br. 14. Commerce's task, to

(footnote continued)

Commerce considers evidence that indicated Customer X's independence from Kangtai, such as the sales trace and accounting documents, as well as detracting evidence, namely that the U.S. downstream customer was included on the bill of lading and that Kangtai attended trade shows, where Customer X's U.S. customers may have been in attendance. See id. at 18–19.[18] However, on review of this detracting evidence, Commerce "s[aw] no reason to infer" that Kangtai was involved in setting prices or other terms of downstream sales or that Kangtai directed

---

determine the existence of a principal-agent relationship, necessitates an accounting of all circumstances, that taken together, weigh in favor of one conclusion. Commerce, here, analyzes each factor individually and then discussed why, in view of all circumstances, including detracting evidence, the record supported a finding that Kangtai and Customer X were not affiliated. See Remand Results at 18–19. It is not the role of the court to reweigh facts and substitute its judgment as to the relative weight of facts for that of Commerce. See Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015).

[18] Commerce further addresses whether the fact that the majority of Kangtai's sales were made to Customer X, i.e., [[          ]], established a close supplier relationship. See Bio-Lab I, 43 CIT at __, 392 F. Supp. 3d at 1270. By regulation, Commerce considers a close supplier relationship, or a relationship that is significant and not easily replaced, in a finding of affiliation based on control. See 19 C.F.R. 351.102(b)(3) (2013); see also Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Final Results of [ADD] Administrative Reviews, 62 Fed. Reg. 18,404, 18,417 (Dep't Commerce Apr. 15, 1997); Issues and Decision Memo. for the Final Determination in the [ADD] Investigation of Multilayered Wood Flooring from the [PRC] at 83, A-570-970, (Oct. 11, 2011), available at https://enforcement.trade.gov/frn/summary/prc/2011-26932-1.pdf (last visited Feb. 21, 2020). Commerce explains that Kangtai entered into business with Customer X only during the POR, and the relationship terminated in 2016, after Kangtai received a high cash deposit rate in the 2014–2015 administrative review. See Remand Results at 17–18. Commerce further notes that there was no evidence that Customer X sourced all or the majority of merchandise from Kangtai during the POR. Id. at 18. Therefore, Commerce reasonably concludes that neither was reliant on one another, irrespective of the level of sales. Id. at 17–18.

Customer X.  Id. at 19.  Commerce also weighs its findings that Customer X does not maintain or take physical custody of the product and does not further process that product.  See id. at 18–19.  However, given that the record evidence provides no indication that Kangtai directed prices Customer X charged to downstream U.S. customers or effected other terms of sale, Commerce concludes, from the totality of the circumstances, that Kangtai and Customer X were not principal and agent.  Id. at 19.

According to Plaintiffs, however, the record is inadequate to support Commerce's determination of non-affiliation, and, even, "as-is," the record does not support that finding.  See Pls.' Br. at 1–5.  Plaintiffs' arguments are unavailing.  Plaintiffs contend Commerce cannot cure a "fundamentally inadequate" administrative record by "rewriting its rationale."  Pls.' Br. at 4.  However, the court in Bio-Lab I explained that Commerce's determination was unreasonable "[w]ithout more evidence supporting its determination, or an explanation after at least considering all the relevant factors[.]"  43 CIT at __, 392 F. Supp. 3d at 1271.  Here, Commerce elected to further explain the basis for its finding, see Remand Results at 20, and, for the reasons discussed above, reasonably determined that the record was sufficient to make its affiliation determination.  Therefore, contrary to Plaintiffs' allegation, even if Commerce's elaboration of its initial finding could be characterized as a "rewrit[ing]," "offer[] [of] a somewhat different rationale," or "repackag[ing]", Commerce followed the court's remand order to reconsider or further explain the

Court No. 18-00051                                                                       Page 17
**PUBLIC VERSION**

basis of its initial findings. Pls.' Br. at 2–4. Further, Plaintiffs, in arguing that the record evidence does not support Commerce's finding of non-affiliation, contest Commerce's interpretation of the record. Pls.' Br. at 5–14. However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo. v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). It is not the court's role to reweigh evidence. See Downhole Pipe, 776 F.3d at 1376.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's Remand Results is sustained. Judgment will enter accordingly.

                                                          /s/ Claire R. Kelly
                                                       Claire R. Kelly, Judge

Dated:    February 26, 2020
            New York, New York